MAILLARD (UNITED STATES v.).    See Case No. 15,709.

MAINE (CALDWELL v.).  See Case No. 2,-304.

---

## Case No. 8,973.

### MAIN et al. v. GLEN.

### [7 Biss. 86.][1]

District Court, W. D. Wisconsin.  Dec., 1875.

BANKRUPTCY — FRAUDULENT SALE—IGNORANCE OF INTENTION—JURISDICTION.

1. A sale by a retail dealer of his entire stock at once is presumably fraudulent, and the presumption of fraud arising from the unusual nature of such a sale can only be overcome by proof on the part of the buyer, that he used all reasonable means to ascertain that the sale was an honest one.

[See Babbitt v. Walbrun, Case No. 694.]

2. It is not enough to show that the buyer did not know that the seller's intentions were to defraud his creditors.

3. A suit to set aside a contract upon grounds created and established by the bankrupt law [of 1867 (14 Stat. 517)], is one over which the federal courts have jurisdiction, and these courts will entertain jurisdiction to prevent their officers being placed in unreasonable jeopardy.

This is a suit in chancery [by W. S. Main and others, assignees] to set aside a pretended sale of the bankrupt's property and effects to the defendant [John Barr Glen] made on the 28th day of January, 1874. The bankrupt, Siegrist, was at the time a merchant at Wausau, doing a general retail business. The defendant was his clerk. The stock of goods invoiced at about $16,000, and the accounts amounted to from $8,000 to $9,000. The bill shows that the bankrupt was largely indebted, and was being pushed for payment before that time, and as early as the beginning of December, 1873; that he went to New York, about the 10th of December, to settle with his creditors, leaving the defendant in charge of his store; that he remained away until the 27th day of January, when he returned to Wausau about noon, and on that day negotiated, and on the morning of the 28th completed a sale to defendant of his entire stock of goods and accounts, and left before noon, without paying any of his debts, and has never returned. It is set up that defendant claims to have paid $13,000 for the goods and accounts, but the bill denies that any such amount was paid. The bill charges that defendant knew of the bankrupt's insolvency, and of his purpose to abscond and defraud his creditors, and that defendant conspired with and aided him in the execution of such purpose. It also shows that on the 30th day of January, some of the creditors disregarding the sale, commenced suits in the state courts, and caused the goods to be seized upon attachments by the sheriff of the county of Marathon; that others of the creditors at once instituted proceedings in bankruptcy against Siegrist, and that this court, sitting in bankruptcy, issued a provisional warrant to the marshal to seize and hold the property of the debtor, and that the marshal presented his warrant to the sheriff and that thereupon he voluntarily surrendered the possession of the goods and store to the marshal, who took and held them until after adjudication of bankruptcy, when provisional assignees were appointed who received them from him and to whom he surrendered them, and that they were sold by the provisional assignees under an order of this court, and the proceeds were ordered to be deposited in the registry of this court to abide the result of the claim of the defendant thereto; and that afterwards this defendant sued the marshal in the state court for wrongfully taking the goods, which suit was still pending, and a part of the relief sought by the bill is an injunction restraining the defendant from prosecuting that suit or any suit for the recovery of said goods or their value, and further providing for an accounting and decree for such portions of the goods as defendant had sold, and for such portions of the accounts as he had collected. The defendant answered denying all fraud or knowledge of insolvency or knowledge of any fraudulent intent by the bankrupt, and denying the authority of this court to restrain the defendant from prosecuting his suit against the marshal in the state court, and setting up that he purchased and paid for the goods and accounts the sum of thirteen thousand dollars in cash, and that the purchase was in good faith and without any intent on his part, or knowledge of any intent on the part of the bankrupt, to defraud his creditors.

William F. Vilas, for complainants.

Gregory & Pinney, for defendant.

HOPKINS, District Judge. The testimony read on the hearing shows beyond a question the insolvency of the bankrupt, and that he intended by the sale to defraud his creditors. This was not disputed by defendant's counsel, but the purchase was sought to be maintained upon the ground that defendant had paid a fair price for the goods, and bought without any knowledge of the bankrupt's circumstances, and without reasonable cause to believe him to be insolvent, and without any knowledge or belief or reason to believe that he was intending to defraud his creditors.

The bankrupt law, section 5130, Rev. St., makes a sale of debtors' property "not made in the usual and ordinary course of business of the debtor, prima facie evidence of fraud." The ordinary course of business of the debtor here, was to sell at retail, and a sale of the whole stock, including accounts and other effects, was clearly outside of his ordinary business, consequently presumptively fraudulent.

A case involving such a sale was before the supreme court of the United States, Wal-

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

brun v. Babbitt, 16 Wall. [83 U. S.] 577, and it was there held that the sale of a retail dealer of his entire stock at once was out of the ordinary course of business of such dealer, and fraudulent, and that the presumption of fraud arising from the unusual nature of such a sale could only be overcome by proof on the part of the buyer that he used all reasonable means to ascertain the pecuniary condition of the seller before making such purchase.

The law casts upon a person purchasing an entire stock of a retail trader the obligation of investigating his condition and motives for such a sale. It pronounces such a sale fraudulent prima facie, and the purchaser must be prepared to overcome that presumption by showing it to have been honest, or that upon vigilant inquiry no reason appeared to doubt its honesty. It is not enough to show that he did not know that the debtor's intentions were to defraud his creditors. The law told him they were, and he should have investigated and ascertained as a fact that they were not. As I have before said, in this case there was no controversy but that the bankrupt made the sale to defraud his creditors, just what the law presumed he did it for, and I do not see, therefore, how the sale can be sustained; the prima facie case is not overthrown, but on the contrary, is fortified by the evidence that the defendant's counsel on the hearing did not attempt to deny that the debtor intended just what the law presumed from the character of the sale, to-wit: to defraud his creditors.

The ignorance of the defendant of the condition and purposes of the bankrupt in making such sale does not defeat this presumption, even if that was established. He should have shown either that the sale was honest in fact, or that from a thorough examination of the seller's affairs he had reasonable cause to believe it to be so, which he wholly failed to do.

But I do not wish to rest my decision alone upon the legal presumption. The evidence supports the charge that the sale was made with intent to defraud the bankrupt's creditors. I do not believe the testimony that the defendant paid $13,000 in cash at that time. The evidence of the defendant and the McDonalds on that question is incredible, and cannot be true.

The transaction as stated by defendant was substantially this: Siegrist on the 10th of December went to New York to see about making some arrangement about his debts, leaving the defendant in charge of his business at Wausau. He wrote to defendant once while there to send him money to pay his expenses; that he returned on the 27th of January following about noon, and that before tea-time of that day the agreement to sell his entire stock of goods, together with his accounts and all other effects at the price of $13,000 was made; that defendant had $5,000 in cash in his possession at that time,

$1,500 of which had been paid to him that day by Mr. Siegrist for gold sold to him while in New York; that before tea he went out and found two young men by the name of McDonald, and borrowed of them $7,000—$4,000 of one and $3,000 of the other; that he also borrowed $1,000 of one Kemp, and that the money was placed in the safe for Siegrist that night.

The defendant was a saloon keeper, and his wife kept a small millinery and dressmaking shop. He, in company with another party bought the saloon of the McDonald boys in July previous, for $1,500, and paid down $600 and got time for the balance by giving a chattel mortgage on property as security. He claims that he had then in his possession $5,000, among which there were three $1,000 bills. He says he got in the money borrowed from the McDonald boys, four more $1,000 bills, and that he paid Siegrist seven $1,000 bills, that on the morning of the 28th he had a formal bill of sale prepared by his attorney, and that the parties and his attorney went to another attorney's office where it was executed and witnessed, and the money was handed over in a package said to contain $13,000, but not counted then by any one, in the presence of this attorney who was used as a witness of the execution of the paper and the passing over the package; that this was before the parties had breakfasted; that the defendant engaged the evening before, at the livery stable, a team to take Siegrist to the railroad at Stevens Point in the morning; that after getting the money Siegrist went away, claiming that he was going to Milwaukee and Chicago to settle his debts, but never returned; that he was owing his clerks and various parties, including his banker, quite a large sum, which he did not pay, and thereupon defendant took possession of the goods; that he did not give the McDonalds any security for the $7,000, nor Kemp for the $1,000, but gave Kemp notes for about $700 against customers and paid him $270 in money the next day, and took up his own note.

Now this story is so strange and unusual, not to say absurd, as to effectually refute itself. The idea that he had such an amount by him, is negatived by his whole life and conduct. There were two responsible banking houses in Wausau, and although he resided there about eighteen months, he had never kept a bank account, but had, as he says, his money in a trunk in his room in the hotel, where he boarded, before his marriage, and after that in his house. If he had that money, why did he get time in purchasing the saloon of the McDonalds in July previous, and why did they then require a chattel mortgage to secure the balance of the purchase price, $900, when they let him have $7,000 on the day of the sale, without any security but his note? Men with money do not do business in that way, and I cannot credit such evidence. He refused on his

examination to divulge his business or his whereabouts during several years of his life, and I think hereafter he should class this transaction and his testimony here among the list of unmentionable acts. The shallow trick of going before an attorney ignorant of the facts and circumstances of the trade, to get him to witness the very formal bill of sale prepared by his own counsel, is an additional circumstance of the fraudulent nature of the whole matter. Such artifices are often employed to give character to a dishonest act, but it is very seldom they do any injury to any one except the party resorting to such practice.

If this sale was made to raise money to pay debts, as he claims he thought it was, why did they go to the office of another attorney to get him to witness the bill of sale and see the money paid over, instead of having their own attorney who prepared the papers and who would naturally be supposed to know something about the affair, sign it and witness the transaction? This part of the affair seems farcical. It seems strange that parties should think that courts could be deceived by such weak inventions. It is unnecessary to consider his testimony further. The transaction was wickedly corrupt and all the parties connected with it were guilty of a most flagrant attempt to defraud the creditors and parties who had confided in Siegrist's integrity, and sold him these very goods on credit.

It is true that the McDonalds corroborated the story of their lending the money. They made out that they loaned him $1,000 more than he wanted, but their characters and business do not warrant a court in giving their story credit. They had been saloon keepers, and sold out to defendant, and had a chattel mortgage to secure them. They were river pilots, and as they themselves swear, quite extensively engaged in gambling, and, in short, they do not account for their having any such amount of money in their possession, and I don't believe it. They probably had some money, but I think if they had had much, they would have loaned it, as the evidence showed they had some time before to the wealthy lumber-men residing there, or have placed it in one of the banks. The story is not such as to receive credit. It is too unreasonable and unnatural. They may have let defendant have some money, and probably did. Siegrist came back knowing he could not pay. He had been sued, and over $1,000 of his debts were past due. He had doubtless made up his mind to abandon the whole concern, and get what he could and flee the country, and the defendant and the McDonalds were just the kind of characters to embark in such a scheme; and I presume they got together what they could and paid over to him, and thought they could cheat the creditors out of their pay. The nature of the transaction and circumstances of the men, convince me that

such was the case and object of the parties. It was a bold, wicked fraud, and has been sought to be maintained by what I cannot but regard as false and corrupt swearing.

I direct that the pretended sale be set aside and declared void, and that the defendant must account for any property he sold or converted, and for all debts that he collected during the time he was in possession under such fraudulent purchase. He must also be enjoined from further prosecuting his suit against the marshal, or any other party for the recovery of said goods or accounts, or any part of them, or from commencing any other or further suits for such purpose.

An objection was taken to the jurisdiction of this court to enjoin the prosecution of the suit against the marshal in the state court. It was argued that it was like the case of Buck v. Colbath, 3 Wall. [70 U. S.] 334, but I do not think it falls within the doctrine of that case. Here the marshal seized the property and delivered it to assignees, and the assignees, by the order of the court, sold it and placed the proceeds in the registry of the court to abide the result of the claimants' rights therein before the suit was commenced in the state court. This court had therefore taken the property, and it alone should have the right to determine the question as to whom it belonged. This is a suit to set aside a contract, upon grounds created and established by an act of congress—the bankrupt law—and doubts have been intimated by the supreme court of this state, of the jurisdiction or duty of the state courts to grant the relief authorized by that law. Brigham v. Claflin, 31 Wis. 607. Such a suit is a suit arising under the laws of the United States, and this court has jurisdiction. The federal courts are the appropriate tribunals for the trial and hearing of such cases, and as the rights of the parties rest upon the provisions of the laws of the United States, the parties have the right to the decision of the supreme court of the United States upon them. After they shall have litigated the case all through the state tribunal, the unsuccessful party may have writ of error from the state court to the United States supreme court. It is not, therefore, an unwarrantable interference with the jurisdiction of the state courts.

This suit has a broader purpose than the suit in the state court. It is to protect the fund in the registry, and to settle the rights of the creditors and defendant to it, so that when these are settled it may be either paid over to the defendant or distributed without further delay among the creditors.

The case of Kellogg v. Russell [Case No. 7,666] was a case like this, and Judge Woodruff held the suit was maintainable. The case of Marsh v. Armstrong [20 Minn. 81 (Gil. 66)] decided by the supreme court of Minnesota, was held to be substantially like the case of Buck v. Colbath, supra. It did not appear in that case that the United

States district court had taken any control of the property, only that the marshal had siezed it by virtue of a warrant which directed him to take the bankrupt's property, like an ordinary execution. But in this case, before the case in the state court was commenced, the marshal had delivered the property to the assignees and the court had taken possession of it and expressly held the proceeds to await the issue of the defendant's claim of ownership. Under such circumstances I think the question of title to the avails was pending in this court when that suit was commenced, and the state court had not jurisdiction of the question. Under such circumstances this court cannot surrender its jurisdiction. This circumstance distinguishes this case from the one decided in Minnesota.

The prosecution of suits against officers of the federal courts in this state, who can alone defend under the provisions of the bankrupt act, when the state courts refuse to enforce those provisions, is placing such officers in unreasonable jeopardy; and when they institute proceedings to test their titles in courts, decided by this state to be the appropriate courts to settle them, to be met with the objection that suits are pending in the state courts, is ungracious, to say the least, and I do not think the objection maintainable. I think this is the appropriate tribunal to determine the controversy, and that it is not an unwarrantable interference with the jurisdiction of the state courts, but a proper and eminently just, if not absolutely necessary, exercise of jurisdiction in this state, in view of the law as settled by the state courts in such matters.

The objection to the jurisdiction is overruled, and a decree is ordered for complainants, as before directed, and that it be referred to a master to take an account of the property converted and accounts collected and not paid over by defendant.

NOTE. To set aside a mortgage as a preference, void under the bankrupt act, it is not necessary to find that the mortgagees knew the condition of the bankrupt and his intentions. It is sufficient if they had reasonable cause to believe him insolvent, and if they had notice of facts sufficient to put them on inquiry they are chargeable with knowledge which an investigation of the bankrupt's condition would have developed. Burpee v. First National Bank of Janesville [Case No. 2,185].